**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOSEPH A. BARKER, Regional )<br>Director of Region 13 of the )<br>National Labor Relations Board, )<br>for and on behalf of the National )<br>Labor Relations Board, )<br> )<br>       Petitioner, )<br> )<br>       v. )<br> )<br>REGAL HEALTH AND REHAB CENTER, )<br>INC., )<br> )<br>       Respondent. ) | No. 08 C 2229 |

**MEMORANDUM OPINION**

Petitioner Joseph A. Barker, Regional Director for Region 13 of the National Labor Relations Board (the "Director"), seeks injunctive relief pursuant to § 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j), against respondent Regal Health and Rehab Center, Inc. ("Regal"), pending the resolution of charges currently before the National Labor Relations Board (the "Board"). For the reasons explained below, the petition is granted.

**BACKGROUND**

In January, February, and March 2008, the Service Employees International Union Local 4 (the "Union") filed three charges with the Board alleging that Regal was engaging in unfair labor

practices. Specifically, the Union alleged that Regal violated §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), which prohibit employers from interfering with employees' self-organizational rights and from discriminating against employees to discourage membership in a union.

On May 5, 2008, the Director consolidated the cases and issued a consolidated complaint and notice of hearing. From May 27, 2008 through May 30, 2008 and on June 25 and 26, 2008, Administrative Law Judge ("ALJ") Margaret G. Brakebusch conducted an evidentiary hearing on the charges. The ALJ issued her Decision on October 6, 2008. The following facts are drawn from the transcripts of the administrative hearing, additional exhibits submitted to the court by the parties, and the ALJ's summary of the facts.

Regal is a corporation that operates a nursing home in Oak Lawn, Illinois. Its owner and president is Michael Lerner. Regal's facility comprises two floors and provides long-term, full-time care to approximately ninety patients. Health care is administered primarily by Licensed Practical Nurses ("LPNs") and Certified Nursing Assistants ("CNAs"). The LPNs provide nursing care and administer medication to the patients and document that care. The CNAs assist patients with daily activities such as moving, bathing, eating, and getting dressed. They also check patients' vital signs and report any changes in patients' condition to the appropriate LPN. In November 2007, there were thirteen LPNs

at Regal.  At the time, their direct supervisor was Durodola Adewolu, the Director of Nursing, who had assumed that position in August 2007.

The Union represents eighty percent of Regal's employees, including housekeeping, laundry, and dietary employees and the CNAs.  The LPNs are essentially the only group of employees at Regal who were not represented by the Union prior to November 2007. In November 2007, the LPNs began attempting to unionize, and several of them testified at the administrative hearing about their union activity.

### Union Activity of Regal's LPNs

#### Kalea Williams

In mid-November 2007, Kalea Williams, who was an LPN at Regal from July 2007 until her termination on March 27, 2008, contacted the Union about representation for the LPNs.  Williams was concerned about the LPNs' working conditions and pay.  After talking with the Union representative, Williams received union authorization cards to distribute to other LPNs.  Williams signed an authorization card on November 15, 2007, and she collected signed authorization cards from ten other LPNs between November 15 and November 18, 2007.  Shortly thereafter in November, Williams submitted the cards to the Union.

Williams and the union representative arranged a union meeting for LPNs, which took place on December 6, 2007 at a McDonald's

restaurant near the nursing home and lasted for about an hour. The meeting was attended by a union representative and LPNs Williams, Dianne Rounds, Michael Thurmond, Shanina Mitchell, and Dianne Gavin. During the meeting, the employees discussed working conditions, the reasons they wanted to be unionized, and the benefits of unionization. They also discussed their boss, Adewolu; Williams testified that she discussed (unspecified) prior allegations of sexual harassment against Adewolu.

When Williams reported to work on December 14, 2007, she spoke with Adewolu in his office. According to Williams, Adewolu told her that he had heard that his name was mentioned at a meeting of the nurses and asked her why she had accused him of sexually harassing someone. Williams replied that it wasn't personal and that she was just raising one of the issues that the employees had with Regal and that "he was one of the issues." (Tr. 55.)

On December 19, 2007, at a Dunkin' Donuts store near Regal's facility, Williams had a second meeting with a union representative. Another LPN, Lavern Harper, also attended this meeting. Williams and Harper both testified that as they were leaving the nursing home, Adewolu asked if they were going to a union meeting, and Williams simply responded that they were going to lunch.

About a week after her December 14 discussion with Adewolu, Williams had another discussion with Adewolu in his office.

Adewolu asked her if it was true that the LPNs were trying to unionize, and Williams confirmed that they were. Adewolu told her that it was illegal for the LPNs to unionize because they were supervisors and could "write people up." Williams replied that she knew her rights, that the LPNs could unionize, and that they were not supervisors because they could not discipline employees. Adewolu told Williams that Michael Lerner would fire "all of them" if they continued to pursue unionization. Williams replied that if Lerner fired her, she would be "sitting at home at Mr. Lerner's expense." (Tr. 57.)

### Lavern Harper

Lavern Harper, who worked for Regal as an LPN from January 1, 2007 until her termination on January 2, 2008, signed a union authorization card on November 17, 2007. She testified that one day in late November 2007, she and another LPN, Angela Bibbs, were standing at the nursing station when Adewolu approached them. He stated that he liked them and did not want them to lose their jobs and explained that he did not want them to join the Union, and if they did, they would be fired. When Harper pretended that she did not understand, Adewolu added that he was aware of the Union, that Lerner would not tolerate it, and that anyone involved in the Union would be fired. Harper and Bibbs asked Adewolu, evidently in jest, if he wanted them to be "spies." Adewolu, possibly missing the joke, responded affirmatively and told them that there would be

"something in it" for them. When they asked him sarcastically if their compensation would be another sixteen straight hours, Adewolu walked away. (At the hearing, Harper was asked to explain this comment, and she testified that the nurses had been working sixteen-hour shifts without overtime pay.) (Tr. 190-91.)

During the week of December 6, 2007, Harper spoke with Adewolu again. Harper was standing with LPN Joanne Harris at the nurses' station when Adewolu approached her and said that he knew about the Union and that "you guys" were "out to get" him. She asked him what he was talking about (because she was aware of the December 6 union meeting but had not been able to attend). He told her not to "play dumb" with him and that he knew she was aware of the meeting. Adewolu told her that he knew that Williams, Thurmond, and Rounds had attended the meeting and threatened that he would terminate their employment for having done so. Harper responded that they have a right to have a union, and Adewolu replied, "Not in Illinois." Harper said that that might be true in Adewolu's home country (Nigeria), but not in the United States. Harper also observed that Adewolu had come to the United States "for equality." Adewolu simply repeated his earlier comment that Lerner would not tolerate anyone being in a union and that the employees would be terminated. (Tr. 193.)

In mid-December 2007, Harper had a discussion with Adewolu about scheduling and staffing levels. Harper asked Adewolu if he

would assign her eight-hour shifts instead of sixteen-hour shifts, and he told her to be patient because he was going to fire some nurses and hire three to four new nurses. He stated that he was going to fire Michael Thurmond because Thurmond "whine[d] like a little girl"; Kalea Williams because Williams "was a pain to his side"; and Dianne Rounds because when he called Rounds to come in to work early, "she was always asleep as if she [were] still growing." (Tr. 194.)

On December 19, 2007, Harper attended the aforementioned union meeting at Dunkin' Donuts with Kalea Williams. Some time near the end of December, Harper had another conversation with Adewolu about the Union. They had worked late and were in Adewolu's car driving to a restaurant. They discussed changes that they would like to see made at Regal. Adewolu remarked that first they needed to "get this union thing out [of] the way" and that the Union was "pretty bad." He also said that the employees should not be involved with the Union because Lerner would fire employees for their involvement. Harper told Adewolu that the employees had a right to have a union, and he responded, "No, this is just really bad. It needs to end." (Tr. 196-97.)

### Dianne Rounds

Dianne Rounds was employed as an LPN at Regal from August 17, 2006 until her termination on January 3, 2008. On November 16, 2007, Rounds signed a union authorization card that had been given

to her by Williams.  Rounds also attended the December 6 union meeting at McDonald's.

### **Michael Thurmond**

Michael Thurmond worked as an LPN at Regal from January 7, 2007 until his termination on January 7, 2008.  On November 18, 2007, Thurmond signed a union authorization card that Williams had given him.  On December 6, 2007, Thurmond attended the union meeting at McDonald's.  He recalls that the employees and the union representative discussed desired workplace changes.  Thurmond also recalled expressing his opinion that Adewolu did not like male employees.

On December 11, 2007, Thurmond telephoned Adewolu to ask if he could work overtime.  During the conversation, Adewolu asked Thurmond, "What's this I hear that [you went to] McDonald's and told the Union rep that I don't like male workers?"  Thurmond laughed, and Adewolu said that he didn't understand why the nurses wanted the union and that it was just a waste of time.  Adewolu also told Thurmond that no overtime work was available.

Some time between December 25, 2007 and the end of the year, Thurmond told three newly-hired nurses his opinion that there were problems at Regal's facility and that the Union could help the nurses get the problems resolved.  Thurmond asked the three nurses if they would be willing to sign union authorization cards, and they said yes, but he did not have any cards with him at the time.

On January 4, 2008, Adewolu called Thurmond into his office and asked him if he wanted to work some overtime hours. Thurmond said that he did not, and when asked why, explained that Regal did not pay time-and-a-half. Adewolu laughed and asked Thurmond why employees were crying for the union as if a union would make any difference. Adewolu also asked Thurmond if he knew that he could be "blackballed" because ninety percent of the [area] nursing homes were Jewish-owned. (Tr. 312-13.)

### Staff Meeting and Terminations

On December 20, 2007, Adewolu and the Assistant Administrator of the facility, Sanuelle Williams ("Administrator Williams"), conducted a staff meeting that approximately sixty to seventy-five employees attended. At the meeting, Administrator Williams announced that Jeraldine Cheatem (a "team leader" CNA and Union steward for the CNAs) would no longer prepare the monthly work schedule for CNAs and that Rhonda White (the Quality Assurance Nurse, who supervises CNAs) would assume that responsibility. Administrator Williams also informed the employees that the LPNs would now be required to prepare daily schedules and patient assignments for the CNAs.

Michael Thurmond testified that subsequent to this staff meeting, he did not follow the instruction to prepare these schedules and assignments for the CNAs and was never disciplined for his failure to do so. Kalea Williams also testified that

shortly after the staff meeting, Administrator Williams told her that because the LPNs were going to be responsible for the actions of the CNAs, the LPNs "had to start writing [the CNAs] up" (presumably for workplace infractions) or the licenses of the LPNs would be in jeopardy. (Tr. 61.) Thereafter, Kalea Williams did not initiate any discipline for a CNA and was never disciplined for her failure to do so.

On January 2 and January 3, 2008, Regal terminated the employment of Lavern Harper and Dianne Rounds, respectively. On January 7, 2008, Regal terminated the employment of Michael Thurmond. Kalea Williams's employment was terminated on March 27, 2008. The specific circumstances of those terminations are discussed _infra_ in context of the ALJ's findings and conclusions.

**The ALJ's Findings of Fact and Conclusions of Law**

The ALJ's findings and conclusions regarding the five issues before her were as follows.

### 1) Whether the LPNs employed at Regal are "supervisors" within the meaning of the Act

The ALJ stated that "[p]erhaps the most pivotal issue in this case [is] whether the LPNs are supervisors as defined by the [Act]." (ALJ Decision at 6.) The issue is pivotal because under the Act, supervisors cannot unionize. NLRB v. GranCare, Inc., 170 F.3d 662, 664-65 (7th Cir. 1999). A "supervisor" is defined as "any individual having authority, in the interest of the employer,

to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). The burden of proving that an individual is a supervisor is on the party asserting such status. NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1313 (7th Cir. 1998).

The ALJ found no evidence that the LPNs at Regal have the authority to hire, transfer, lay off, recall, promote, discharge, or reward any other employees, nor any evidence that they have the authority to set wage rates or evaluate other employees. Regal contended, however, that the LPNs have the authority to suspend, assign, discipline, direct, and adjust the grievances of other employees, and that LPNs use independent judgment in CNA staffing, scheduling, and assignment of duties and in monitoring CNAs' work.

The ALJ noted that a large portion of Regal's evidence concerning the supervisory status of LPNs was presented through the testimony of Adewolu, Administrator Williams, and White, who are all members of management. Additional testimony was presented through several LPNs and CNAs. Many of the LPNs who testified on Regal's behalf were hired after the union organization campaign had begun and after the changes to LPN duties were made that are

alleged to have violated the Act. (ALJ Decision at 17.) The ALJ also noted that in many instances, there was little or no supporting documentation to substantiate the managers' testimony.

The ALJ reached the following conclusions regarding Regal's LPNs: they do not use independent judgment in determining whether additional CNAs are needed or in selecting additional CNAs to be called in for work; they do not schedule CNAs' breaks and lunches; they do not use a sufficient degree of independent judgment in assigning CNA duties and in monitoring CNAs' work; they do not possess or exercise authority to discipline employees, because the LPNs merely document substandard performance without making recommendations for further action; they function as mediators in CNA disputes rather than authoritative decision-makers; they do not "responsibly direct" CNAs because they are not accountable for, or disciplined for, CNAs' poor work performance; and they do not have the authority to "suspend" employees within the meaning of the Act, because they have no greater discretion than any other employee in handling reports of patient abuse. The ALJ concluded that the evidence presented by Regal was not sufficient to establish that LPNs at Regal are "supervisors" under the Act.

The ALJ further found that the changes to the LPNs' duties that were announced at the December 2007 staff meeting constituted an attempt to convert the LPNs into supervisory employees in violation of the Act. Regal argued that LPNs had the authority to

discipline CNAs and to make CNA daily assignments prior to December 2007 and that the meeting simply reminded LPNs of that authority, but the ALJ found that the record did not support that proposition. According to the ALJ, the evidence did not reflect that LPNs had these duties prior to the meeting, and she noted that the attempted shifting of responsibilities occurred just days after the first union meeting and during the period when Adewolu was engaged in unlawful interrogation, threats, promises, and other actions in violation of the Act, which are discussed _infra_.  The ALJ concluded that "the timing of this altering of LPN duties demonstrates both an illegal motive and animus."  (ALJ Decision at 18.)

### 2) Whether Regal, acting through Adewolu, engaged in multiple violations of § 8(a)(1) of the Act

The administrative complaint alleged that between November 2007 and January 4, 2008, Adewolu engaged in seventeen separate violations of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[1]  As described _supra_, several LPNs testified that Adewolu interrogated them about their union activities, sometimes repeatedly; threatened them with reprisals; stated that unionization would be futile; created the impression that their union activities were under surveillance; and promised certain employees rewards if they

---

[1]  29 U.S.C. § 158(a)(1) provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  Employees are guaranteed the rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  29 U.S.C. § 157.

engaged in surveillance of other employees.

During the administrative hearing, Adewolu denied that he had any knowledge of the union organization effort prior to January 10, 2008, when he received notice of the charges from the Board. Although Adewolu made blanket denials of each alleged violation, he never confirmed or denied that he had conversations with Kalea Williams, Lavern Harper, or Michael Thurmond on the dates or in the circumstances those employees described. Regarding Adewolu's alleged comments that Lerner would fire anyone engaging in union activity, Adewolu claimed that he (generally) did not talk with Lerner and did not have his telephone number.

The ALJ found the LPNs' testimony far more credible than that of Adewolu with respect to the alleged conversations about the LPNs' union activities. She found that Adewolu's assertion that he did not talk with Lerner to be "disingenuous" and that Adewolu was "very much aware that the Union was trying to organize the last group of unrepresented employees at [Regal]." (ALJ Decision at 50.) The ALJ further found that Adewolu threatened employees with discharge and other reprisals for engaging in union activity, created an impression that employees' union activities were under surveillance, interrogated employees about their union activity, informed employees that it would be futile to unionize, and in one instance promised employees a reward for engaging in surveillance of other employees' union activity.

### 3) Whether Regal issued a warning to Kalea Williams in violation of §§ 8(a)(1) and (3) of the Act

Another issue in the administrative proceeding was whether Regal unlawfully issued a disciplinary warning to Kalea Williams on March 20, 2008. The ALJ concluded that although Regal had knowledge of Williams's union activity and had demonstrated animus, Regal met its burden of showing that it would have disciplined Williams in the absence of any union activity. The Director does not include the warning issued to Williams as a basis for injunctive relief in this action. Accordingly, we will not address the matter.

### 4) Whether Regal terminated the employment of Kalea Williams, Lavern Harper, Dianne Rounds, and Michael Thurmond in violation of §§ 8(a)(1) and (3) of the Act

The Director's Second Amended Petition for injunctive relief alleges that Regal discharged Lavern Harper, Dianne Rounds, and Michael Thurmond in retaliation for their union activities, in violation of §§ 8(a)(1) and (3) of the Act.[2] Earlier versions of the petition had included the termination of Kalea Williams as a basis for relief, but the Director abandoned this basis after the ALJ concluded that Regal had shown that it would have terminated Williams's employment even in the absence of the protected union activity.

---

[2] 29 U.S.C. § 158(a)(3) provides that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

As for Harper, Rounds, and Thurmond, the ALJ concluded that General Counsel for the Board demonstrated that Regal had a discriminatory motive in terminating them and that the record did not support a finding that Regal would have terminated them in the absence of their union activity. We will briefly discuss the ALJ's findings as to Harper, Rounds, and Thurmond.[3]

The ALJ first set forth the test established by the Board for analyzing claims of unlawful termination in Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enforced, 662 F.2d 899 (1st Cir. 1981). "Under the Wright Line analysis, we begin by considering whether the General Counsel has proven that anti-union animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions, and, if such a showing is made, we then determine whether the employer can avoid liability by demonstrating that, notwithstanding any anti-union animus, it would have taken the same action for legitimate reasons." International Union of Operating Eng'rs, Local 150 v. NLRB, 325 F.3d 818, 826 n.11 (7th Cir. 2003).

Lavern Harper's employment was terminated on January 2, 2008. Her written notice cited four reasons for termination: (1) failure to give a patient the proper dosage of medication; (2) failure to document a patient discharge; (3) failure to document a patient's

---

[3]/ As to the circumstances of the terminations of Williams, Harper, Rounds, and Thurmond, the ALJ heard extensive testimony and reviewed many documents that the parties submitted.

refusal of treatment; and (4) leaving medication unattended on a cart. (GC Ex. 23.) The ALJ concluded that the alleged medication dosage error was a fabricated basis for Harper's termination because the document upon which Regal relied contradicted its position that Harper erred. She also found that the alleged failure to document a patient's refusal of treatment was pretextual, noting that it was unsupported by Regal's own records and that Regal's witnesses contradicted each other. Regarding the alleged failure to document a discharge, the ALJ credited Harper's testimony that she had documented the discharge and that this note must have been removed from the patient's chart, stating that it appeared from all of the evidence that this basis for termination was added to bolster Regal's pretextual assertions. The ALJ further found that it was questionable whether Harper actually left medication on a cart unattended and that the lack of evidence concerning this alleged incident made it more likely that the infraction was another pretextual basis for Harper's termination.

Dianne Rounds's employment was terminated on January 3, 2008. Her brother had telephoned the facility on January 1, 2008 to notify Regal that Rounds would not be coming in to work as scheduled due to a death in the family. Regal contended that Rounds was terminated because she violated Regal's attendance policy by "calling off" on a holiday after having a history of "calling off" seven times in the period of February 2007 to June

2007. The ALJ rejected this explanation for the termination as false, noting that Regal did not assert that Rounds had failed to comply with its requirement that employees "call off" at least four hours before the start of a shift and that there was nothing in Regal's attendance policy requiring employees to follow a different procedure for holidays or otherwise addressing holiday attendance. The ALJ also observed that Rounds had never received a written warning prior to her discharge, that Regal's progressive discipline policy had not been followed, and that Regal presented evidence of only two incidents of prior discipline involving holiday attendance, neither of which was similar to Rounds's situation.

Michael Thurmond's employment was terminated on January 7, 2008. His discharge allegedly stemmed from an incident that took place on January 2, 2008. On that date, Thurmond reported to work and received a daily report on patients from LPN Joanne Harris. Thurmond and Harris had worked together at another facility eight years earlier, and Thurmond opined that Harris harbored hard feelings toward him because at that facility, Harris had been physically attacked by a fellow employee, and Thurmond and the other employees had not intervened.

When Thurmond was conducting his nursing rounds, he came upon a patient who was sweating and had an increased respiration rate. He examined her and found that her stomach was bloated and that she was covered in feces, and he noticed that her gastrointestinal

feeding tube was leaking. Thurmond immediately called the respiratory nurse and a CNA, Cheatem, for assistance, and then stopped the tube feeding, pumped the patient's stomach, and induced the patient's vomiting. Thurmond then documented what had occurred in a note, asked the other nursing personnel to sign it, and placed it under Adewolu's door. Thurmond called the patient's doctor, and the patient was sent to the hospital. In her testimony, Cheatem corroborated Thurmond's account of the incident.

On January 5, 2008, Thurmond was completing a shift and Harris was beginning a shift. Thurmond and Cheatem testified that when Harris arrived, she made a scene, repeatedly using profanity and yelling at Thurmond for reporting the incident with the patient. Thurmond testified that Harris also made the comment that Thurmond "knew her history," and that Thurmond had replied that he knew her history with failing to hang a gastrointestinal tube properly and not being familiar with patient medication.

Thurmond immediately telephoned Administrator Williams about Harris's behavior, and Administrator Williams spoke with Harris, Thurmond, and Cheatem. Administrator Williams told Thurmond that Harris had accused Thurmond of threatening her and that Administrator Williams would handle the matter when she returned to work on Monday, January 7. Thurmond denied that he had threatened Harris and explained that the only "history" he had discussed with Harris consisted of the recent events regarding the patient.

Administrator Williams instructed Cheatem to obtain statements from witnesses about the altercation, and Cheatem obtained such statements from Thurmond and another employee. Cheatem herself also prepared a statement in which she stated that there was no physical contact between Thurmond and Harris and that no threats were made.

Administrator Williams testified that later in the day, Harris telephoned to inform her that Harris had contacted the police on the ground that Thurmond made the comment that "history repeats itself" and that this was a threat because Thurmond had knowledge that fellow employees had attacked her in the past. Administrator Williams also testified that Thurmond telephoned her that afternoon about the police report and indicated that his comment about history repeating itself was related to Harris's previous altercation with other nurses.

It is undisputed that on January 6, 2008, Thurmond telephoned Deborah Kipp, Regal's Director of Operations, and told her what had occurred. He discussed his concern that Harris had contacted the police after he had left Regal on January 5 and that he did not want to be arrested when returning to work on January 7. According to Thurmond, Kipp assured him that the matter would be resolved.

Shortly after arriving at work on January 7, 2008, Administrator Williams received a telephone call from Kipp in which Kipp mentioned that Thurmond had telephoned her. Administrator

Williams explained to Kipp what had occurred over the weekend.

Cheatem telephoned Administrator Williams around 10:00 a.m. that day and told Williams that she had three statements concerning the altercation and that she would bring them to Regal later in the day. When Cheatem arrived at Regal around noon, Administrator Williams informed her that she had decided to terminate Thurmond. Cheatem asked Williams how she could have made this decision already when she had not read the statements or spoken with anyone. Administrator Williams replied that she had spoken with "people" and that she knew Thurmond was the one who had caused the problem.

According to Thurmond, a meeting was scheduled on January 7 for Administrator Williams, Adewolu, Thurmond, and Harris to discuss the incident, but on the advice of counsel, Thurmond did not attend the meeting because he did not have a witness available. Later that day, Administrator Williams telephoned Thurmond and informed him that Regal was terminating his employment. Williams explained to Thurmond that she had previously instructed him never to call her boss, Kipp, but he had done so anyway. Williams also stated that she had heard that Thurmond was "nothing but problems, anyway" and that he had been complaining about Regal and "hollering" about the Union. Williams added: "Let me tell you something, Michael, you go and tell the union to get your job back."

Administrator Williams testified that despite Cheatem's

statement that no threats were made, she decided to discharge Thurmond because she believed that his comment to Harris about history repeating itself constituted a threat. She also stated that the fact that Thurmond contacted Kipp and failed to follow the chain of command was a factor in her decision to terminate Thurmond. Administrator Williams acknowledged that no employees at Regal have ever been fired for making verbal threats or for "breaking the chain of command." (Tr. 1053.)

Regal documented its reasons for Thurmond's termination in two separate notices, both dated January 7, 2008. There is no evidence that either form was given to Thurmond. Although the form lists thirteen potential reasons for "employee action/discipline," none of the corresponding boxes are checked on either form; the only information provided on each notice is handwritten, evidently by Administrator Williams, in a section titled "DESCRIBE WHAT HAPPENED." One of the notices states:

> Michael made a comment to a co-worker "History will repeat itself." He and this coworker use [sic] to work together at another facility and due to this history she felt threatened by this statement and called the police. He admitted to administrator that he made the comment but he was talking about patient care. He is being discharged for threatening a co-worker.

(Regal Ex. 13.) The other notice states:

> Michael Thurmond has been instructed on several occasions to follow the proper chain of command. He was asked by administration to allow her the opportunity to complete an investigation regarding a conflict with a co-worker. He failed to allow her the opportunity to complete

investigating. He instead called the Director of
Operations on Sunday, Jan. 6, 2007. He is being
discharged for failure to follow reasonable instructions.

(GC Ex. 37.) Administrator Williams testified that she prepared
two notices in an attempt to "be thorough." (Tr. 1054-55.)

The ALJ found that Thurmond's union activities were known to
Regal prior to Thurmond's termination and that Adewolu and
Administrator Williams's testimony that they were unaware of these
activities was contradicted by credible evidence. The ALJ also
found that Administrator Williams's creation of two discharge
notices and her attempt to embellish Thurmond's alleged threat
during her testimony[4] indicated "shifting reasons" for discharge
from which a discriminatory motive could be inferred. The ALJ
noted that there was no evidence that Administrator Williams made
any attempt to investigate what truly occurred on January 5 and
concluded that Regal "seized the opportunity to rid itself of one
of the employees who had shown interest in the Union." (ALJ
Decision at 38.)

### 5) <u>Whether a Gissel bargaining order is warranted</u>

General Counsel for the Board sought (and currently seeks) an
order requiring Regal to bargain with the Union. Pursuant to <u>NLRB</u>

---

[4] Administrator Williams testified that when she asked Thurmond what
"history will repeat itself" meant, Thurmond explained to her that "[Harris] got
her ass kicked at Halsted Terrace [nursing home] and she's going to get her ass
kicked again here." (Tr. 941.) On cross-examination, Administrator Williams
acknowledged that Thurmond had simply said that "history will repeat itself" and
she "[did]n't know" where "the part about [Harris] getting her ass kicked" came
from. (Tr. 1130.)

v. Gissel Packing Co., 395 U.S. 575, 613-14 (1969), an order requiring an employer to bargain with a union in the absence of an election may be issued in two situations: (1) where the unfair labor practices are so "outrageous" and "pervasive" that they "are of such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had"; and (2) in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." The Seventh Circuit has explained:

> Determining the appropriateness of a bargaining order requires, then, careful analysis of the nature of the misconduct and its lasting effects. The Board may not ignore the . . . rights of the employees to express their preferences; however, it also must not countenance serious employer misconduct and the remedy must be severe enough to deter effectively such future conduct. In achieving this balance, the Board must follow the dictates of Gissel and its progeny and consider whether less drastic measures would serve the balance of interests. At all times, the Board is charged with accomplishing and articulating this balance of interests against the backdrop of its obligation to craft a remedy for employer misconduct that is remedial rather than punitive.
>
> The "classic" bargaining order case is, of course, the Gissel-type circumstance where the employer has thwarted its employees' efforts at organizing union representation. In such cases, the courts have recognized the efficacy of the bargaining order only after a determination that the unfair labor practices have rendered an election an unreliable means of testing the union's claim of majority.

Ron Tirapelli Ford, Inc. v. NLRB, 987 F.2d 433, 441 (7th Cir.

1993).

The ALJ found that Regal's pattern of unfair labor practices had a "strong tendency to undermine the Union's majority support, especially in a Unit as small as the 13 employees here." (ALJ Decision at 51.) The ALJ also stated: "Beginning immediately after employees attended the first Union meeting, [Regal's] Director of Nursing initiated an intensive effort to discourage employees from further support or interest in the Union," listing Adewolu's unfair labor practices. (Id.) The ALJ further found that Regal fired three of the union supporters in a five-day period without warning, and in so doing, rid itself of almost 25 percent of the bargaining unit. Because "[s]uch egregious conduct was not lost on this small Unit of employees and it is conduct that is likely to linger in the memories of all the employees who were spared discharge," the ALJ held that a Gissel bargaining order was warranted. (Id. at 51-52.)

**The ALJ's Recommended Relief**

Based on her findings of fact and conclusions of law, the ALJ recommended that Regal be ordered to take the following actions:

> 1. Cease and desist from: threatening employees with discharge and other unspecified reprisals for engaging in union activity; promising employees that they would receive a reward for participating in surveillance of employees engaged in union activity; telling employees that it would be futile to select the Union as their bargaining representative; creating an impression that the employees' union activities are under surveillance; interrogating employees about their union membership, activities, and sympathies; threatening to blackball employees because they engaged in union activities;

discharging employees because they engage in union activities; altering employees' working conditions in order to prevent them from selecting the Union as their bargaining representative; and in any other way interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by the Act.

2. Remove from its files any reference to the unlawful discharges of Harper, Rounds, and Thurmond and notify them of this action, and not rely on these discharges in any way in the future.

3. Offer Harper, Rounds, and Thurmond full reinstatement to their former positions or, if the position no longer exists, to the substantial equivalent, and to make these individuals whole for any loss of earnings suffered as a result of the discriminatory discharges.

4. Preserve records so that the necessary amount of back pay can be determined.

5. Recognize and bargain with the Union as the exclusive representative of the LPNs, and, if an understanding is reached, embody that understanding in a signed agreement.

6. Post copies at its facility of an NLRB form notice to employees concerning the labor law violations.

7. Provide the Director with sworn certification that Regal has taken these steps to comply with the Act.

(ALJ Decision at 54-55.)

The ALJ's decision is not the final administrative decision of the Board. Both Regal and the Union have filed exceptions to the ALJ's decision, and the parties are now awaiting the Board's decision. The Director seeks injunctive relief pending the Board's resolution.

## **DISCUSSION**

Section 10(j) of the National Labor Relations Act authorizes

a district court to grant temporary injunctive relief pending the Board's final resolution of unfair labor practice proceedings if such relief would be "just and proper." 29 U.S.C. § 160(j). Relief under § 10(j) should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." <u>NLRB v. Electro-Voice, Inc.</u>, 83 F.3d 1559, 1566 (7th Cir. 1996). "The court looks to the same factors to which it looks in other contexts when deciding whether to grant injunctive relief . . . ." <u>Lineback v. Spurlino Materials, LLC</u>, 546 F.3d 491, 499-500 (7th Cir. 2008). Thus, the Director will be entitled to interim relief when (1) the Director has a reasonable likelihood of prevailing on the merits of the complaint; (2) there is no adequate remedy at law; (3) "the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;" and (4) public harm would occur in the absence of interim relief. <u>Id.</u> at 500 (quoting <u>Bloedorn v. Francisco Foods, Inc.</u>, 276 F.3d 270, 286 (7th Cir. 2001)). The Director bears the burden of establishing the first, second and fourth of these circumstances by a preponderance of the evidence. <u>Id.</u> The third prong is evaluated on a sliding scale; the better the Director's case on the merits, the less his burden to prove irreparable harm, and vice versa. <u>Id.</u> We have no jurisdiction to pass on the merits of the underlying case before

the Board; rather, our "mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual." Electro-Voice, 83 F.3d at 1567.

### Likelihood of Success

The Director makes a showing of a likelihood of success by demonstrating that his chances are "better than negligible." Spurlino, 546 F.3d at 502. The substantive labor-law violations alleged by the Director are that Regal violated § 8(a)(1) of the Act by threats, interrogations, statements of futility, promises of benefits, and creating an impression of surveillance and §§ 8(a)(1) and (3) of the Act by altering the LPNs' working conditions and discharging Harper, Rounds, and Thurmond because of their union activities and sympathies.

The Board's test for determining whether an employer's communications with employees interfere with employees' statutory rights and therefore violate § 8(a)(1) is an objective one; the employer's motive in making the statements is irrelevant, as are the effects. Miller Elec. Pump & Plumbing, 334 N.L.R.B. 824, 824 (2001). An employer violates the Act when it threatens job loss, Aldworth Co., 338 N.L.R.B. 137, 142-43 (2002), or "blackballing" because of union activities, Hall Constr., 297 N.L.R.B. 816, 818 (1990), or when it conveys the futility of seeking union

representation, <u>Miller</u>, 334 N.L.R.B. at 825. An employer also violates the Act when it creates an impression of surveillance, which occurs when an employee would reasonably assume from a given statement that his union activities had been placed under surveillance, <u>Tres Estrellas de Oro</u>, 329 N.L.R.B. 50, 51 (1999), or promises a reward if employees agree to engage in surveillance of their coworkers' union activities, <u>Ishikawa Gasket America, Inc.</u>, 337 N.L.R.B. 175, 183-84 (2001). An interrogation of an employee will be found to violate § 8(a)(1) if, considering all the circumstances, it reasonably tends to interfere with employees' organizational rights. <u>Sunnyvale Med. Clinic, Inc.</u>, 277 N.L.R.B. 1217, 1217 (1985).

As for § 8(a)(3), which prohibits discrimination in regard to hire or tenure or a term or condition of employment to discourage union membership, an employer violates this provision by altering the duties of employees in order to convert them into supervisors, <u>Dickerson-Chapman, Inc.</u>, 313 N.L.R.B. 907, 939-40 (1994), as well as by discharging employees for engaging in union activities.

We have recited the facts of this case in such great detail because they speak for themselves and leave us little doubt that the Director will prevail. The evidence regarding Adewolu's statements--threatening firings and blacklisting, implying that Regal was keeping tabs on employees' union activity and offering incentives for employees to keep tabs on other employees' activity,

repeatedly asking employees about the union organization efforts and remarking on the futility of those efforts--is overwhelming. Adewolu denied making these statements, but the ALJ did not find his testimony to be credible, and, conversely, found the testimony of Kalea Williams, Harper, and Thurmond to be "far more credible." (ALJ Decision at 50.) The ALJ's credibility determinations have substantial basis in the record.

As for altering the working conditions of its LPNs, Regal produced very weak evidence that the LPNs possessed supervisory authority prior to the December 2007 staff meeting. The suspect timing of the attempt to alter the LPNs' duties led the ALJ to conclude that Regal had an illegal motive and animus in so doing.

The Board is also very likely to find that Regal knew about the union activity of Harper, Rounds, and Thurmond, that the activity was a motivating factor in their terminations, and that Regal would not have terminated them in the absence of the union activity. The ALJ found that Regal's proffered reasons for terminating these three employees were pretextual. In our view, there is substantial evidence that supports the ALJ's determinations.

"Evaluating the Director's likelihood of success calls for a predictive judgment about how the NLRB is likely to rule. The ALJ is the NLRB's first-level decisionmaker, and, having presided over the merits hearing, the ALJ's factual and legal determinations

supply a useful benchmark against which the Director's prospects of success may be weighed." Spurlino, 546 F.3d at 502 n.4 (internal quotation marks and brackets omitted).[5]   Based on the record evidence, and considering the thorough and well-reasoned decision of the ALJ, we conclude that the Director has a very strong chance of succeeding on the merits of the alleged violations.

### The Balance of Harms & Adequacy of a Remedy at Law

To establish the need for injunctive relief, the Director must show that Regal's employees will suffer irreparable harm during the passage of time between the filing of the charges and the resolution of the complaint by the Board and that the employees have no adequate remedy at law.   See Spurlino, 546 F.3d at 500-01. The Director argues that the Union was in the process of trying to obtain Board certification as the LPNs' bargaining representative when Regal terminated the employment of Harper, Rounds, and Thurmond--all union supporters--from a unit consisting of only thirteen LPNs, thereby devastating the union organization efforts. According to the Director, the resulting delay in bargaining and the erosion of union support among the LPNs constitute irreparable harm.   The Director submits the affidavits of Kalea Williams, Harper, and Thurmond (all of which are dated May 2008).   Thurmond states that there have been no union meetings since he was

---

[5]/  Regal's unsupported implication that we are not permitted to consider the ALJ Decision in assessing the Director's likelihood of success is therefore rejected.

terminated. Williams states that after the terminations of Harper, Rounds, and Thurmond in January 2008, other employees did not want to talk with her about the Union, and after Williams's termination in March 2008, at least two employees who had signed union authorization cards would not return her phone calls.

Regal contends that it reinstated the employment of Harper, Rounds, and Thurmond in December 2008 and that no unfair labor practices are alleged to have occurred since late 2007, and therefore the Director has not shown the need for immediate injunctive relief. In Regal's view, because the three LPNs have been reinstated, there is "nothing [left] for the court to enjoin or mandate" before the Board's final ruling. (Resp. to Pet'r's Br. at 8.) Regal also argues that an injunction is not necessary because of the Director's delay in seeking relief from this court and because "the administrative hearing has already taken place, exceptions have already been filed and all that awaits is the final order of the Board." (Id. at 9.)[6]

"The process of NLRB resolution has long been recognized as extraordinarily slow--indeed, the purpose of section 10(j) was to prevent employers from taking advantage of this significant passage of time in their efforts to quash union support in the interim."

---

[6] Before the Director filed the affidavits of Williams, Harper, and Thurmond, Regal also argued that there was no evidence of a chilling effect on the union organization efforts. Regal did not seek to file anything in response to the affidavits.

<u>Spurlino</u>, 546 F.3d at 500.  Regal attempts to minimize this concern by arguing in its recent status report to the court that the Board has made decisions in as short a time frame as three months.  In its amicus brief, the Union calls our attention to the Board's statistics on the time elapsed for certain stages of case processing in unfair labor practice cases.  According to the most recent Annual Report of the NLRB, the median number of days from an ALJ's decision to the issuance of a Board decision is 269.  73 NLRB Ann. Rep. 138 (2008).  The ALJ's decision in this case was issued in October 2008, so we might expect a ruling from the Board some time this summer, if this case is typical.  However, the Director calls our attention to the unusual circumstances currently affecting the Board: it is operating with only two members instead of the usual five.  <u>See</u> NLRB, About Us: Overview: Board, http://www.nlrb.gov/about_us/overview/board/index.aspx  (last visited May 13, 2009).  Given that the Board is seriously shorthanded, it could be quite a while before it renders a decision in this proceeding.

In addition, we reject Regal's argument that there was any undue delay in the Director's request for injunctive relief.  The instant petition was filed on April 18, 2008, only a month after the Union filed the third of its three charges with the Board and before the Director consolidated the cases and issued a notice of hearing.

Regal's argument that because Harper, Rounds, and Thurmond have been reinstated, there is nothing remaining for us to decide, is also rejected.  As described <u>infra</u>, the Director seeks several injunctions in addition to reinstatement of the employees.  The reinstatements do not moot the other forms of relief requested by the Director, such as the issuance of a <u>Gissel</u> bargaining order.

"The longer that [an] employer is permitted to benefit from a state of affairs that its own wrongdoing has brought about, the less likely it is that a final order in the Board's favor will be able to redress the wrongs that have been done and to restore the status quo ante." <u>Bloedorn</u>, 276 F.3d at 300.  This risk is "particularly true in cases involving fledgling unions, where the passage of time is especially critical." <u>Spurlino</u>, 546 F.3d at 501.  "As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. . . . [T]he employees remaining at the [facility] know what happened to the terminated employees, and fear that it will happen to them.  The union's position in the [facility] may deteriorate to the point that effective organization and representation is no longer possible.  As time passes, the benefits of unionization are lost and the spark to organize is extinguished.  The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." <u>Electro-Voice</u>, 83 F.3d at 1573.  These irreparable harms are

present here, where the union meetings and organization efforts ceased after the terminations.[7] For the same reasons, there is no adequate remedy at law.

Although there is not a great deal of evidence about what occurred at Regal after the terminations, the evidence that Regal engaged in pervasive unfair labor practices is strong, and a strong likelihood of success can offset a weaker showing of irreparable harm. Id. at 1568. That the affidavits of Kalea Williams, Harper, and Thurmond are somewhat stale and that Harper, Rounds, and Thurmond were reinstated does not change our analysis because Regal continues to argue in the Board proceedings that the affected employees were "justly terminated," the ALJ erred by crediting the LPNs' testimony, the LPNs are supervisors, and a Gissel order is not warranted. (Resp. to Pet'r's Br., Ex. 4, Employer's Exceptions to ALJ's Decision.)

Considering the balance of harms, Regal does not even argue that it would be harmed by an injunction, other than to state in a conclusory fashion that a Gissel order would be "devastating" and a "particular hardship." (Resp. to Pet'r's Br. at 17.) The balance of the harms favors the Director.

**The Public Interest**

We also examine whether § 10(j) relief is in the public

---

[7] It is also significant that a quarter of the bargaining unit at the time--3 of 13 employees--was terminated.

interest, weighing the potential public benefits against the potential public costs. Electro-Voice, 83 F.3d at 1573-74. The Seventh Circuit has indicated that "the interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process." Bloedorn, 276 F.3d at 300 (internal quotation marks omitted). "The public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed" because of the protracted nature of Board adjudication. Electro-Voice, 83 F.3d at 1574 (internal quotation marks omitted).

The public interest would be served by interim injunctive relief here due to the pervasive and serious nature of the alleged unfair labor practices and the strong evidence that supports the Director's allegations. Regal's contention that there is no public interest involved because it is a small employer and the LPNs are a small unit is without merit. Interim relief will "help to preserve the Board's remedial authority and in that way serve the collective bargaining process." Bloedorn, 276 F.3d at 300. Furthermore, there is no evidence that injunctive relief would lead to any public harm. Interim relief is therefore in the public interest.

### The Requested Relief

The Director requests that we order Regal to do the following:

- Cease and desist from coercively interrogating

employees, creating an impression of surveillance, creating an impression of futility of union activities, promising a reward for spying on protected activities, threatening to blackball employees, threatening employees with termination in retaliation for union activities, disciplining employees in retaliation for union activities, terminating employees in retaliation for union activities, changing terms and conditions of employment in retaliation for union activities, and in any like manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by § 7 of the Act.

- Offer reinstatement to Harper, Rounds, and Thurmond.

- Temporarily expunge any references to the discharges of Harper, Rounds, and Thurmond from their personnel files and not rely on the discharges in any future discipline imposed prior to a final Board order.

- Recognize, and, upon request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the LPNs.

- Post a copy of our opinion and order at Regal's facility where notices to employees are usually posted (free from obstructions and defacements), maintain the posting throughout the administrative proceedings, and allow agents of the Board access to Regal's facility to monitor compliance with this order.

- Withdraw instructions that LPNs are required to discipline CNAs or to make room assignments to CNAs.

- Within twenty days of the issuance of our order,[8] file with the court and serve on the Director a sworn affidavit from an agent of Regal that sets forth, with specificity, the manner in which Regal has complied with the court's order, including how the opinion and order have been posted.

(Second Am. Pet., Prayer for Relief.)

---

[8] The Director uses the phrase "within twenty days of the issuance of the District Court's decision and order," but because our memorandum opinion is being issued before our order, this relief should be tied to the date of our order.

The request for the reinstatement of Harper, Rounds, and Thurmond is moot because those employees have already been reinstated, but the remainder of the requested relief will be granted because the Director has satisfied all of the requirements to demonstrate that injunctive relief is "just and proper."

Regal contends that we should not grant "such drastic relief" because we previously denied its motion to depose the Director and Regal was thereby prejudiced.  Regal is rehashing the Director's motion to quash the notice of deposition issued by Regal to the Director, which we granted because there is no reason to believe that his deposition would produce or lead to admissible evidence. The Director was not involved in the facts underlying this case, and Regal does not explain how his deposition would serve any useful purpose.  Regal places great emphasis on the fact that the Director verified the Second Amended Petition by attesting that "the statements therein made as upon personal knowledge are true and those made as upon information and belief, I believe to be true."  But this verification does not mean that the Director participated in or has any personal knowledge of the underlying facts concerning the events at Regal's facility (as opposed to the facts concerning the administrative proceeding, which are not in dispute), or that his deposition would be useful.  Regal's argument is thus rejected.

## **CONCLUSION**

Because injunctive relief is "just and proper," the petition of Joseph A. Barker, Regional Director for Region 13 of the National Labor Relations Board, for injunctive relief pursuant to § 10(j) of the National Labor Relations Act is granted, except that an order to offer interim reinstatement to Lavern Harper, Dianne Rounds, and Michael Thurmond will not be entered because those employees have already been reinstated.

The Director should confer with respondent Regal Health and Rehab Center, Inc. regarding an injunctive order that conforms with this opinion and submit a proposed order to the court by May 25, 2009.

DATE:     May 13, 2009

ENTER:    _____

John F. Grady, United States District Judge